IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| Tokio Marine Am. Ins. Co., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 4:18-cv-00931-HFS |
| | ) | |
| Professional Svs. Ind. Inc., | ) | |
| et. al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Defendant Hunt Plumbing Company has filed a motion to reconsider this Court's order denying its motion for summary judgment. (Doc. 118). Hunt has also filed a second motion for summary judgment arguing that Plaintiffs' claim for damages against it are subject to the acceptance doctrine affirmative defense. (Doc.119). The motion for reconsideration is DENIED. The motion for summary judgment based on the acceptance doctrine is GRANTED.

**Motion to Reconsider - Background. (Doc.118).**

Three insurance companies Tokio Marine America Insurance Company (Tokio), Mitsui Sumitoma Insurance Company (Mitsui), and Liberty Mutual Fire Insurance Company (Liberty), filed suit seeking recovery for amounts paid its insureds, Toyota Motor Sales, USA ("Toyota") and Haldex Brake Products ("Haldex") as a result of a warehouse roof collapse. Toyota and Haldex were tenants in the warehouse.

Defendants Professional Service Industrial, Inc. (PSI), and Schefers Roofing Company (Schefers) entered into contracts with the warehouse owner to provide design and construction services for a new roofing system at the warehouse. Defendant Schefers

1

entered into a contract with Hunt Plumbing Company (Hunt) to perform plumbing work for the roof project. The roof collapsed approximately five months after the completion of the roofing system. After the insurers paid claims for loss made by tenants Haldex and Toyota, Haldex and Toyota assigned any claims they may have against others for their loss to their insurers. The insurers then filed this action against PSI, Schefers, and Hunt.[1]

The parties filed cross-motions for summary judgment (Docs. 56, 65, 68, 70), and this court granted summary judgment to PSI and Schefers, concluding that plaintiffs' claims were barred by the waiver of subrogation clauses contained in the Lease Agreements between Haldex and Toyota and their landlord. (Doc. 115). However, I concluded that the waiver of subrogation did not extend to defendant Hunt and that ruling is the basis for this motion to reconsider. Hunt asks the Court to reconsider its ruling that the waiver of subrogation contained in the lease agreements between Haldex and Toyota and their landlord did not bar the insurers' claims against Hunt.

In the original summary judgment ruling, I considered the following documents: 1) Haldex and Toyota Lease Agreements; 2) Tokio and Liberty insurance policies; 3) Assignment of claims from Toyota and Haldex; and 4) the various agreements between the defendants and CBRE, the successor to the lease agreements.[2]

---

[1] The parties do not dispute that Haldex and Toyota assigned their claims to their insurers and that the plaintiff insurers stepped into the shoes of their insureds.

[2] Cobalt Industrial REIT was the original property owner, landlord and signatory to the Haldex and Toyota Lease Agreements. (Doc. 62 ¶ 2,3, Doc. 56-1 Exs. 3,4). Colfin Cobalt I-II Owner, LLC, (CBRE) became the landlord and party to the leases as the successor-in-interest to Cobalt Industrial REIT. (Doc. 64 ¶¶ 3,4). Section 26.4 of the Lease Agreements provided " . . . this Lease shall be binding upon, and inure to the benefit of, the successors and assignees of the parties hereto . . . " (Doc. 56-4 Exs. 3, 4).

2

I first determined that pursuant to Sections 1.2[3] and 11.5[4] of the Lease Agreements, a party who qualifies as an "Agent" is barred from recovery as Section 11.5 of the Lease Agreements **"**waive any and all rights to recover against the other or <u>against the Agents of such other party</u> for any loss or damage to such waiving party . . . ". (emphasis added). The plaintiff insurers conceded this point, stating that the waivers of subrogation contained in Section 11.2 of the Lease Agreements protected defendants "if they are agents of the Landlord." (Doc. 56-1, p. 11). Thus, the determinative question in ruling on the cross-motions for summary judgment boiled down to whether Schefers, Hunt, and PSI were considered agents of the landlord pursuant to the Lease Agreements.

In deciding this question, I considered the arguments of Schefers and PSI separately from Hunt, because unlike the other two defendants, Hunt did not have a direct contract with the landlord - Hunt's contract was with Schefers.

After looking to the June 1, 2016, Consulting Contract (Doc. 56-6, Ex. 5) between PSI and CBRE[5] as well as the September 16, 2016, Service Agreement between Schefers and CBRE, (Doc. 56-7, Ex. 6), I concluded that PSI and Schefers were "contractors" of the landlord as defined in the Lease Agreements. Because the Lease Agreements specifically included

---

[3] 1.20 <u>Agents.</u>   Officers, partners, directors, employees, agents, licensees, contractors, customers and invitees; to the extent customers and invitees are under the principal's control or direction.  (Doc. 56-4, 56-5, Exs. 3, 4).

[4] 11.5 <u>Waiver of Subrogation</u>:  **Landlord and Tenant each waive and shall cause their respective insurance carriers to waive any and all rights to recover against the other or against the Agents of such other party for any loss or damage to such waiving party (including deductible amounts) arising from any cause covered by any property insurance required to be carried by such party pursuant to this Article XI or any other property insurance actually carried by such party to the extent of the limits of such policy.** Tenant, from time to time, will cause its respective insurers to issue appropriate waiver of subrogation rights endorsements   to all    property through Tenant,  to execute and deliver to Landlord and Landlord's management company such a waiver of claims and to obtain such waiver of subrogation rights endorsements.(Docs. 56-4, 56-5 Exs. 3, 4).

[5] The parties do not dispute that CBRE was the agent of the landlord.

"contractors" in the definition of "Agents," the waiver of subrogation clause in the Lease Agreements protected these two defendants. Accordingly, summary judgment was granted to PSI and Schefers on their claim that the waiver of subrogation in the Lease Agreements barred the insurers' claims against them.

**Schefers-Hunt Contract.**

On September 16, 2016, Schefers entered into a contract with Hunt Plumbing to "furnish all labor and material to install 8 new 8" roof drains at new height and 8 new 5" overflow drains at new height." (Doc. 56-8, Ex. 7).

I concluded that Hunt was subject to a different analysis than the other two defendants because Hunt's contract was with Schefers, not the landlord. I rejected Hunt's arguments: (1) that as a subcontractor of Schefers, it was a third-party beneficiary of the waiver of subrogation clause contained in the respective leases; and (2) that it was protected by the subrogation waiver because it "is a contractor; therefore . . . an agent of the Landlord." Because Hunt did not enter into a contract with the landlord, it cannot be considered a "contractor" under the Lease Agreement. Further, because the anti-subrogation provisions in the Lease Agreement did not "clearly express" an intent to benefit those not in contract with the landlord, Hunt cannot be considered a third party beneficiary of the waiver of subrogation contained in the Lease Agreement. *Cf.* <u>Haren & Laughlin Const. Co., Inc. v. Jayhawk Fire Sprinkler Co., Inc.,</u> 330 S.W.3d 596, 600 (Mo.App.E.D. 2011) (general contract included subcontractors in indemnification clause). Accordingly, I concluded that Hunt was not entitled to protection by the waiver of subrogation clause in the Lease Agreements and that oral argument was unnecessary.

4

Now, Hunt seeks reconsideration of the March 17, 2020, Order arguing: (1) that it did not have a fair opportunity to argue its waiver of subrogation defense because the Court denied it's request for oral argument; and (2) that the order misconstrued Missouri law and the terms of the Lease Agreements.

**Third-Party Beneficiary to Schefers Service Agreement with CBRE**.

Hunt first takes issue with the ruling that it is not a third-party beneficiary to the Lease Agreement between CBRE and Schefers. Hunt makes a new argument in this motion, arguing that it is a third-party beneficiary to the waiver of subrogation in the Lease Agreement because Defendant Hunt shared in the Service Agreement between Schefers and CBRE an therefore, there was privity with the landlord. (Doc. 118 p. 5). Hunt relies on Article 8 of the Service Agreement between CBRE (landlord) and Schefers, which provides:

> Contractor agrees that this Agreement shall not be assigned, transferred or **shared by Contractor** with any other person, firm, or corporation **without the prior written notification and approval of Manager.** Contractor agrees that this Agreement is assignable by Manager to Owner and its assignees. ( Doc. 56-7, Ex. B) (emphasis added).

Hunt contends that pursuant to this Article, Schefers "shared" the Service Agreement it had with the landlord with Hunt, and therefore, Hunt stands in privity with the landlord. As evidence that the Landlord had notice and approval as required by Article 8, Hunt points to: (1) pre-bid meeting notes indicating Landlord had "no preference on a plumber" and (2) the requirement that Hunt must name the owner/landlord as additional insureds on its liability insurance policy. (Doc. 118). Hunt acknowledges that it did not

5

raise this argument in its original briefing, explaining that if the Court had permitted oral argument, it would have raised the argument then.

Hunt's arguments do not establish error in the Court's March 26 order. First, it is within the court's discretion to grant oral argument. See Local Rule 7.0(b). Further, the new arguments that Hunt says it would have raised during oral argument are now considered, and rejected, so there is no prejudice to Hunt.

The Service Agreement between the landlord and Schefers was an agreement whereby Schefers agreed to "furnish all tools, materials, labor, equipment and other items necessary to perform overlay of existing roof with new TPO roof . . . and other related services." (Doc. 56-7). Article 8 of the Service Agreement addresses the transfer, assignment or sharing of the Service Agreement, and does not support Hunt's interpretation that by hiring a subcontractor it somehow "shared" the agreement. Schefers hired Hunt to perform plumbing work to fulfill its obligations to the landlord but did not share the Service Agreement with Hunt.

Second, even if Article 8 could somehow show privity, the Article specifically **precludes** assignment, transfer or sharing of the Agreement unless there was notice and approval from the landlord. (emphasis added). Hunt's evidence of notice and approval consists of: (1) notes from a pre-bid meeting that the landlord "had no preference on a plumber" (Doc.122-3) and (2) evidence that Hunt was required to include Landlord as an additional insured on its insurance policy. (Doc. 122-3,4).

This evidence does not establish notice or approval on the part of the landlord such that it could be concluded that Schefers somehow shared the Service Agreement with Hunt. A note that the Landlord had "no preference on a plumber" is indefinite and

6

ambiguous and does not constitute "notice and approval." Evidence that Hunt was required to include Landlord as an additional insured on its insurance policy shows only a requirement as to insurance on the part of Hunt, and does not constitute notice and approval from Landlord/Owner.

Hunt further argues that this Court misconstrued Missouri law by concluding that Hunt is not a third-party beneficiary to the waiver of subrogation contained in the Lease Agreements. As acknowledged, the Missouri Supreme Court has held that it is not necessary for one to be a party to a contract to claim its benefits, Butler v. Mitchell-Hugeback, Inc., 895 S.W.2d 15, 21 (Mo. 1995) (*citing* Peters v. Employers Mut. Casualty Co., 853 S.W.2d 300, 301 (Mo. banc 1993)) and that a third-party beneficiary may sue on a contract made for the benefit of the third party. Slate v. Boone Cty. Abstract Co., 432 S.W.2d 305, 307 (Mo. 1968). Under Missouri law, for a nonsignatory to be a third-party beneficiary of a contract, the terms of the contract must clearly express intent to benefit the nonsignatory or an identifiable class of which the nonsignatory is a member. *See* Torres v. Simpatico, Inc., 781 F.3d 963, 971 (8th Cir. 2015).

Hunt argues that the required clearly expressed intent is shown by the fact that its contract with Schefers required it to name the Landlord as an additional insured on its liability policy and waive claims against the Landlord. Hunt argues this is compelling evidence that it is a third party beneficiary to the Lease Agreement and cites Butler v. Mitchell-Hugeback, Inc., 895 S.W.2d 15 (Mo. 1995) as support. In Butler, the Missouri Supreme Court considered whether a warehouse owner waived its subrogation rights against an architect with whom it had contracted to design a "retrofit." Butler, 895 S.W.2d at 18. The architect was a third-party beneficiary of a

7

construction contract in which the owner and contractor "waive[d] all rights against [each other and the architect] . . . . to the extent covered by property insurance obtained pursuant to this paragraph[ ] or other property insurance applicable to the Work[.]" Id. at 21. The Butler court held that, according to the plain language of the subrogation waiver, the owner waived its rights to recover against the architect "only to the extent of the value of the 'Work.' " Id. at 22. The Court considered the insurance requirement to determine the intent of the parties in defining "work," not in deciding whether the architect was a third party beneficiary to the subrogation waiver. Id (court's interpretation was "strengthened" by other provisions in the contract requiring the contractor to purchase and maintain insurance for damages in excess of the value of the work itself.)

The question here is whether Hunt qualifies as a third party beneficiary to the waiver of subrogation contained in the Lease Agreement which is a different question than that presented in Butler. Hunt concedes in its reply brief that the party seeking third-party beneficiary status in Butler was included in the general contract. (Doc. 122 p. 7). Nevertheless, Hunt characterizes its argument as an "equitable" one, contending that "if it was required to name the Landlord as additional insured's and waive subrogation, it would only be equitable for Defendant Hunt to fall under the waiver of subrogation provision contained in the lease agreement of the Plaintiffs' insured's." (Doc. 122, p. 7). However, Hunt fails to provide authority for it's equitable argument and because Hunt does not fall within the identifiable class of persons intended to benefit from the waiver contained in the Lease Agreements, Hunt is not entitled to enforce the waiver of subrogation as a third party beneficiary. *See* RLI Ins. Co. v. Triumph, 341 S.W.3d 821

8

(Mo.App.W.D. 2011) (third party entitled to status as third party beneficiary of waiver of subrogation when third party included in general contract waiver of subrogation and third party's contract is either silent or does not expressly negate the rights claimed as a third party beneficiary).

**Hunt qualifies as an Agent under the Lease Agreement.**

Hunt also contends that the Court committed error in construing the Lease Agreement, arguing that Section 1.20 does not limit "contractors" to only the Landlord's contractors but should also be read to include Landlord's subcontractors. Hunt emphasizes that if the parties intended for Section 1.20 to apply only to the Landlord's "contractors," then the parties would have clearly included such a limitation. Hunt points out that the Lease Agreement limited the definition of "customers and invitees" to "the extent customers and invitees are under the principal's control or direction," as evidence that the parties should have further defined contractors to exclude subcontractors from protection. Hunt offers no authority or other evidence that the Lease Agreement should be construed to include "subcontractors" as "contractors." *See* Disabled Veterans Trust v. Porterfield Const. Inc., 996 S.W.2d 548, 552 (Mo.App.W.D. 1999) ("disagreement by the parties as to the proper interpretation of a contract does not render the contract ambiguous").

For these reasons, Hunt's motion for reconsideration is DENIED. (Doc. 118).

9

Case 4:18-cv-00931-HFS   Document 129   Filed 12/23/20   Page 9 of 19

**Motion for Summary Judgment- Acceptance Doctrine. (Doc. 119).**

Hunt has also filed a new motion for summary judgment, arguing that Plaintiffs' claims for damages are barred by the acceptance doctrine.

The acceptance doctrine provides that a "contractor, after an acceptance of the work by the owner, is not liable to third parties, who have no contractual relations with him, for damages subsequently sustained by reason of his negligence in the performance of his contract duties." Gruhalla v. George Moeller Constr. Co., 391 S.W.2d 585, 597 (Mo. Ct. App. 1965) (citing Casey v. Wrought Iron Bridge Co., 89 S.W. 330 (1905); Begley v. Adaber Realty & Inv. Co., 358 S.W.2d 785 (Mo. 1962); White v. Springfield, 173 S.W. 1090 (1915)).

Acceptance of the work is "attended by the presumption that the owner [or other principal] made a reasonably careful inspection of the work, knows of its defects, and so 'accepts the defects and the negligence that caused them as his own.'" Coleman v. City of Kan. City, 859 S.W.2d 141, 146 (Mo. Ct. App. 1993); Weber v. McBride & Son Contracting, Co., 182 S.W.3d 643, 645 (Mo. App. 2005). Further, Missouri law does not require the contractor to have completed all of the work before applying the acceptance doctrine. Wilson v. Dura-Seal & Stripe, Inc., 519 S.W.3d 479, 482-83 (Mo. App. 2017) (finding that because the owner had regained possession and use of the premises, it had accepted the work despite the fact that the defendant contractor returned to the premises to correct the deficiencies in its "initial completed work").

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Courts must view all facts in the

10

light most favorable to the non-moving party and resolve all doubts against the moving party. Scott v. Harris, 550 U.S. 372 (2007).

Hunt argues that the acceptance doctrine bars plaintiffs' claims because: (1) the work that gave rise to the claim was completed; (2) the work was "turned over" to the owner of the property, and (3) the work was "accepted" by the owner of the property. Gruhalla, 391 S.W.2d at 597.

More specifically, Hunt contends that the undisputed facts[6] establish that PSI completed three inspections of the roof during the project and a final inspection, five months before the first roof collapse. (Doc.123 Resp. ¶ 8, 9). Defendant PSI represented to CBRE that the Roof Project was complete and CBRE informed the owner that the Roof Project was complete and directed the Owner to pay Schefers in full. (Doc. 123 Resp. ¶ 12, 14). Since CBRE accepted and paid Schefers in full completion for the Roof Project, Hunt contends that it is presumed that CBRE/Owner made a reasonably careful inspection of the work, knew of its defects, and so accepted the defects and the negligence that caused them as his own. *See* Coleman, 859 S.W.2d at 146*;* Weber, 182 S.W.3d at 645.

Hunt contends that this situation is controlled by decision of the Missouri Court of Appeals in Wilson v. Dura-Seal and Stripe, Inc., 519 S.W.3d 479 (Mo.App.W.D. 2017). In that case, Dura-Seal paved a drive lane, but the paving did not extend all the way to the curb, resulting in a gutter area and height differential. Plaintiff Wilson claimed she

---

[6] Plaintiffs dispute some of these facts as alleged by Hunt. (Doc. 123 p. 3-7). However, none of the disputed facts are material to resolution of this motion especially because plaintiffs concede the acceptance doctrine applies. (Doc. 123 p. 1).

11

tripped on the gutter due to the height differential. Wilson sued the school district for which Dura-Seal did the work, and the school district then sued Dura-Seal.

The Missouri Court of Appeals affirmed the trial court's entry of summary judgment for Dura-Seal, concluding that because the school district accepted the work, the contractor was not liable. The acceptance doctrine is founded on the assumption that the owner has made a reasonably careful inspection of the work of the contractor and the owner knows of the defects, if any. The owner then "accepts the defects and negligence that caused them as his own." "Whether the initial completed work conformed to industry standards or specifications is not at issue because we presume the owner accepts and takes on any negligence in construction." 519 S.W.3d at 482-83 (citing Coleman, 859 S.W.2d at 146).

Plaintiffs concede that the acceptance doctrine applies.[7] (Doc.123, p. 1 ("Plaintiffs . . . do not dispute the application of the acceptance doctrine."). However, plaintiffs argue that the undisputed facts in this case fall within the "imminently dangerous" exception to the acceptance doctrine. *See* Begley v. Adaber Realty & Inv. Co., 358 S.W.2d 785, 791 (Mo. 1962). The Missouri Supreme Court created an exception to the "general rule of nonliability after acceptance of the work for injuries to third persons with whom the contractor is not in a contractual relation" known as the "imminently dangerous" exception. Id. When an owner is not aware of the defective condition and is not easily able to

---

[7] Because plaintiffs do not dispute that Hunt has established the affirmative defense of the acceptance doctrine, it is unnecessary that we evaluate the parties detailed statements of facts with respect to the application of the acceptance doctrine, as both parties agree that the doctrine applies.

12

determine that a defect exists, the owner is not in a position to correct the condition and under those circumstances the contractor should bear liability for injuries sustained." McCoy v. Simon Sign Erection Co., 858 S.W.2d 827, 829 (Mo. Ct. App. 1993).

"[The imminently dangerous] exception applies when: [1] the structure was so defectively constructed as to be essentially and imminently dangerous to the safety of others; [2] the defects are so hidden and concealed that a reasonably careful inspection would not have disclosed them, and [3] these things are known to the defendants but not to those who accepted them." Begley, 358 S.W.2d at 791. When the evidence establishes these three elements the liability of the contractor is "where it would have been had there been no acceptance." Coleman v. City of Kan. City, 859 S.W.2d 141, 144 (Mo. Ct. App. 1993) (*quoting* Casey v. Wrought Iron Bridge Co., 64, 89 S.W. 330, 335 (Mo. Ct. App. 1905). *See also* Chubb Grp. of Ins. Cos. v. C.F. Murphy & Assocs., Inc., 656 S.W.2d 766, 775-76 (Mo. Ct. App. 1983) (imminently dangerous exception applies equally to personal injury claims and equally claims for property damage).

Hunt responds that this exception does not apply when a structure is built in compliance with the owner's design and specifications and accepted by the owner. Gast v. Shell Oil Co., 819 S.W.2d 367 (Mo. 1991). Because the parties do not dispute that the acceptance doctrine applies, this court must only consider whether the imminently dangerous exception applies.

1. Defective construction amounting to imminently dangerous.

The first element of the imminently dangerous exception is that the "structure was so defectively constructed as to be essentially and imminently dangerous to the safety of others." Wilson 519 S.W.3d at 483 (internal citations omitted). The Court explained: "if the

construction is such that danger may be anticipated therefrom by reason of its very defects it is imminent or inherent, even though it does not occur immediately or soon after use." Begley, at 791. "It is in the context of imminent or inherent danger, and not the creation of a general duty, therefore, that foreseeability of injury to persons not in privity functions in the exception to the rule of nonliability after acceptance." Coleman, 859 S.W.2d at 144.

Plaintiffs contend that the plumbing work was defectively constructed and qualifies as imminently dangerous. Plaintiffs point to expert testimony that the roof collapse was caused by the installation of inadequate primary and secondary drainage systems. Specifically, plaintiffs point to expert testimony that Hunt's plumbing work was defective because Hunt installed: (1) 8-inch drains to existing 6-inch piping in the primary drainage system and (2) 5-inch over flow drains to existing 6-inch piping in the secondary drainage system. (Doc. 123, p. 8- 12). Plaintiffs' theory of negligence is that Hunt's "installation of primary and secondary drainage systems . . . were grossly undersized, non-compliant with the UPC, and contrary to PSI's design," thereby reducing the drainage rate of water accumulating on the roof, which caused overloading on the roof and ultimate collapse.' (Doc. 123 , p. 17).

Hunt does not refute plaintiffs' theory as to causation. Instead, Hunt's response is simple: Defendant Hunt's plumbing work was not defective because Hunt did as it was instructed and contracted to do by Schefers and installed 8-inch drains to the existing 6-inch piping in the primary drainage system and installed 5-inch overflow drains to the existing 6-inch piping in the secondary drainage system. (Doc. 124) (emphasis added). Hunt emphasizes that it was never contemplated that the existing piping would not be

14

used and Hunt's contract was to install the new drains to the existing piping.  Hunt argues that plaintiffs are confusing defects in the design with defects in construction, and the inadequate drainage was not caused by the installation of the drains, but rather, the use of the existing piping. Hunt's argument is persuasive.

First, Plaintiffs do not assert that Hunt was responsible for the roof design. To the contrary plaintiffs allege that Defendant PSI "served as the engineering and design consultant for the design and construction of [the roofing project] at the warehouse properties." (Doc.1 ¶4)  Defendant PSI's services included four phases: (1) pre-design survey, (2) development of roof overlay plans and specs, (3) construction admin, and (4) and quality assurance. (Doc.124 ¶5). Plaintiffs further admit that Defendant Schefers "served as the contractor responsible for implementing the Roofing Project engineered and designed by PSI." (Doc. 1 ¶ 5).

Even though plaintiffs do not allege or suggest that Hunt had any responsibility for the roof design or drainage study, the parties disagree as to whether Hunt complied with PSI's design. Hunt states it was only responsible for installing the drains pursuant to its contract with Schefers which consisted of a one page confirming letter, stating that Hunt was to be paid $12,250 to install "8 new 8" roof drains at new height and 8 new 5" overflow drains at new height. (Doc. 56-8, Ex. 7).[8]  Plaintiffs' argue that Hunt's work was more

---

[8] In the order denying Hunt's motion for summary judgment, the court stated "Schefers entered into a contract with Defendant Hunt Plumbing Company, Inc. ("Hunt") to construct and implement drainage components of the roofing system ("plumbing work") engineered by Defendant PSI. (Doc. 115, pp. 1 and 5). Plaintiffs now argue that the court's use of the words "construct and implement drainage components" is somehow a finding that that Hunt had a contractual responsibility for some part of the roof drainage in its contract with Schefers. There was no such finding by this Court, as there was no examination of the scope of work conducted by Hunt and the court was merely referencing the Hunt-Schefers contract.

15

expansive, relying on a General Note 5 in the PSI design drawings. (Doc. 123, p.8 ¶ 4 and Ex. 2). Note 5 of the PSI design drawing stated: "install 8" roof drains, deck support, framing, conductors, conductor hangers, connections, and components necessary for a complete installation." (Doc. 123, Ex.2).

Part of General Note 5 is consistent with the Hunt-Schefers contract requiring the installation of 8" roof drains. However, the other parts of General Note 5 including "deck support, framing, conductors, conductor hangers connection and components necessary for a complete installation" is not included in the Hunt-Schefers contract, and plaintiffs do not point to any evidence that the additional work contemplated by Note 5 was Hunt's responsibility.

Plaintiffs do not refute Hunt's statement that it was not asked to bid on anything beyond installing the roof drains and overflow drains. Nor do plaintiffs offer evidence to refute Hunt's statement that it did not bid on any of the framework required for setting the drains at their new height and that Schefers performed such work. (Doc. 124, Exhibit F). Further, plaintiffs do not contradict evidence that Hunt's bid did not include replacement of the entire drainage system or that Schefers asked or proposed Hunt to include replacement of the existing piping in their bid. (Doc. 124 Ex. F).

Note 5 indicates that new 8" roof drains were to be installed, however, there is no indication in the Note that this work would require removal and replacement of smaller diameter existing piping associated with the roof drains. Hunt also points to a PSI Addendum design drawing for the roofing system which shows the installation of drains at the existing internal gutter system and does not indicate that existing piping was to be

removed and replaced with pipes of the same diameter as the roof drains. (Doc. 124-3). This supports Hunt's position that it installed the drains in accordance with the plans prepared by PSI, which did not include replacing the existing piping.

Mr. Hunt of Hunt Plumbing indicated in his deposition that during the pre-bid meeting he was informed that the existing roof drain piping was to be utilized in conjunction with the new drains. (Doc. 124-2 p.5). Another expert testified that PSI's December 13, 2016 inspection report indicated that the new roof drains were to utilize the old drain piping. (Doc. 124-3). This evidence also supports Hunt's position that the removal and replacement of the existing roof drainage pipes was not expected or included in the agreed upon plumbing work. (Doc. 124-2 p. 9).

A decision by the Missouri Supreme Court in Gast v. Shell Oil Co., 819 S.W.2d at 371, supports Hunt's position. In that case, the Missouri Supreme Court held that imminently dangerous exception does not apply when a structure is built in compliance with the owner's design and specifications and accepted by the owner. The Court reasoned that the contractor "owed **no duty** to the [owner's] employees with respect to the **design** of the modifications" made to the cashier's room. *Id.* (emphasis added). Like the plaintiffs in Gast, plaintiffs' here are mischaracterizing their argument as to one of installation, despite undisputed evidence that the problem was one of design. For these same reasons, plaintiffs' argument that the plumbing work was not in compliance with the Uniform Code of Plumbing and that that Hunt had a duty to correct the plumbing work is not compelling – the defect was one of design and not installation.

Furthermore, plaintiffs cannot meet their burden of showing the remaining two elements necessary to apply the imminently dangerous exception. Hunt's plumbing work

17

was subject to four inspections by PSI and there is no suggestion that the drains were "hidden." *See* Dura-Seal, 519 S.W.3d. at 483 ("exception requires that even a 'reasonable careful inspection' would not have disclosed the alleged defect). The final inspection performed by PSI indicated inspection of the "general drainage characteristics" as well as the roof top equipment and drains. (Doc. 120-3). Furthermore, there is no evidence presented that Hunt had any knowledge that its work was inadequate or defective or any concealment of the same. As Hunt points out, if Hunt would have known of a defect in its plumbing work, then that defect would also have been known by Defendant PSI, who designed the Roof Project and performed four inspections of the Roof Project, and it also would have been known by Schefers, the general contractor for the project. *See also* Butler, 895 S.W.2d at 19 (considering a question as to the statute of limitations and defining "conceal" as "an affirmative act, something actually done directly intended to prevent discovery or to thwart investigation").

Therefore, in applying Gast to the present case, because Plaintiffs accepted Defendant Hunt's limited plumbing work, which was in compliance with PSI's design specifications, Plaintiffs cannot meet their burden of proof regarding the application of the imminently dangerous exception and summary judgment is warranted in favor of Defendant Hunt based upon the acceptance doctrine.

For these reasons, Defendant Hunt's motion for reconsideration is DENIED. (Doc. 118). It is further ORDERED that Defendant Hunt's motion for summary judgment is GRANTED. (Doc. 119).

18

Case 4:18-cv-00931-HFS   Document 129   Filed 12/23/20   Page 18 of 19

s/ HOWARD F. SACHS

HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE

December 23, 2020
Kansas City, Missouri